UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| The Steel Network, Inc., | ) | |
| | ) | Case No. 09-81230 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Applied Science International, | ) | |
| LLC, | ) | Case No. 09-81231 |
| | ) | |
| Debtor. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

These cases came before the court on May 3, 2011, for hearing on an application by Bank of America, N.A. and Banc of America Leasing & Capital, LLC ("Applicants") for allowance of attorneys' fees and reimbursement of expenses pursuant to section 506(b) of the Bankruptcy Code ("Application").  Robert A. Cox, Jr. appeared on behalf of the Applicants; John H. Small appeared on behalf of the Debtors, The Steel Network, Inc. ("TSN") and Applied Science International, LLC ("ASI"); David A. Matthews appeared on behalf of the Unsecured Creditors' Committee ("Committee"); and Robyn C. Whitman appeared on behalf of the United States Bankruptcy Administrator ("BA").

MATTER BEFORE THE COURT

In the Application (Docket No. 484), the Applicants seek attorneys' fees of  $245,845.80 and reimbursement of expenses of

$6,829.44 which were paid by the Applicants to McGuireWoods LLP, the attorneys engaged by the Applicants. The Application includes an itemization (Exhibit B to the Application) which describes the services performed by the attorneys and paralegals at McGuireWoods and which states the dates on which the services were rendered, the identity of the attorney or paralegal performing the services and the amount of time spent in performing the services. Objections to the Application were filed on behalf of the Committee and the Bankruptcy Administrator.  Having considered the Application, the objections, the evidence offered at the hearing and the arguments of counsel, the court makes the following findings and conclusions pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure:

1.    The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) which this court may hear and determine.

2.    On July 24, 2009 (the "Petition Date"), the Debtors filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

3.    Bank of America ("BofA") is a secured creditor of The Steel Network, Inc. ("TSN"), as set forth in more detail in Proof of Claim No. 45 (the "BofA Claim"), filed in the amount of $2,313,070.41.   The BofA Claim arises from that certain loan agreement dated December 6, 2007 by and between BofA and TSN (the

"BofA Loan Agreement"), pursuant to which BofA provided TSN a revolving line of credit in the original maximum credit limit of $4,250,000.00. TSN's obligation to BofA pursuant to the BofA Loan Agreement was secured by all of TSN's assets pursuant to that certain security agreement dated December 6, 2007 by and between TSN and BofA (the "BofA Security Agreement"). Copies of the BofA Loan Agreement and the BofA Security Agreement are included in the BofA Claim.

4.    Banc of America Leasing & Capital, LLC ("BALCAP") is a secured creditor of TSN, as set forth in more detail in Proof of Claim No. 66 (the "BALCAP Term Loan Claim"), filed in the amount of $403,111.91. The BALCAP Term Loan Claim arises from that certain note and security agreement (No. 06649-00701) dated as of June 28, 2004 by and between BALCAP and TSN (the "BALCAP Term Loan Agreement"). TSN's obligation to BALCAP pursuant to the BALCAP Term Loan was secured by certain "Units" defined in the BALCAP Term Loan. A copy of the BALCAP Term Loan Agreement is included in the BALCAP Term Loan Claim.

5.    BALCAP also is a secured creditor of TSN, as set forth in more detail in Proof of Claim No. 65 (the "BALCAP Lease Claim"), filed in the amount of $4,310,049.24. The BALCAP Lease Claim arises from that certain master lease agreement (No. 06649-90000) dated as of July 31, 2006 by and between BALCAP and TSN and the schedules thereto (collectively, as amended, the "BALCAP Lease"). TSN's

obligation to BALCAP pursuant to the BALCAP Lease was secured by certain "Equipment" defined in the BALCAP Lease. A copy of the BALCAP Lease is included in the BALCAP Lease Claim.

6.    The Debtors filed their Modified Second Amended Joint Plan of Reorganization on October 5, 2010 (Docket No. 377), which, as amended (the "Plan"), was confirmed on December 6, 2010 pursuant to the Order Confirming Modified Second Amended Joint Plan of Reorganization (Docket No. 454).

7.    Under the Plan, the BofA Claim is classified in Class 6. The Plan treats the BofA Claim as a secured obligation in an amount equal to outstanding principal, interest, fees and expenses under the BofA Loan Agreement.

8.    Under the Plan, the BALCAP Term Loan Claim is classified in Class 7. The Plan treats the BALCAP Term Loan Claim as a secured term loan to be paid in full over time in regular monthly payments as provided by the Plan.

9.    Under the Plan, the BALCAP Lease Claim is classified in Class 8. The Plan treats the BALCAP Lease Claim as a secured lease to be paid in full over time as provided under the BALCAP Lease.

10.   Pursuant to section 506(b) of the Bankruptcy Code, an oversecured creditor is entitled to collect reasonable fees, costs, or charges from the assets of the bankruptcy estate if those fees or charges are expressly provided for in the loan and security agreements.    To  substantiate  a  claim  for  fees  pursuant  to

section 506(b), the creditor must show that: (a) the creditor is oversecured; (b) the underlying agreement provides for such fees and costs; and (c) the fees and costs are reasonable and necessary. In re Gwyn, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993).

11.   It has been conceded throughout this case that BofA and BALCAP are oversecured creditors.   Neither the Debtor nor the Committee has contended otherwise.   The amended plan that was confirmed in this case treats the BofA and BALCAP claims as secured claims that are to be paid in full and provides in paragraph 3.6(a)(6) that all attorneys' fees allowed under section 506(b) are to be paid by the Debtors.   The court thus is satisfied and finds that BofA and BALCAP are oversecured creditors and that the first requirement under section 506(b) therefore has been satisfied.

12.   While it is undisputed that the BofA and BALCAP agreements contain provisions that provide for the recovery of attorneys' fees under the circumstances described in such provisions, there is a dispute as to whether certain of the fees sought in the Application fall within such provisions.   The starting point for dealing with the second requirement under section 506(b) is to examine the language of the provisions relied upon by BofA and BALCAP as providing for the recovery of the fees sought in the Application.

13.   The BofA Loan Agreement provides, in relevant part, the following:

> [TSN] shall reimburse BofA for any reasonable costs and
> attorneys' fees incurred by BofA in connection with the

enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver "workout" or restructuring under this Agreement, . . . In the event that any case is commenced by or against [TSN] under the Bankruptcy Code (title 11, United States Code) or any similar or successor statute, [BofA] is entitled to recover costs and reasonable attorneys' fees incurred by [BofA] related to the preservation, protection or enforcement of any rights of [BofA] in such a case.

(BofA Loan Ageement, § 11.6)

14.   The BALCAP Term Loan Agreement provides, in relevant part, the following:

[TSN] also agrees to reimburse and pay to [BALCAP] on demand all expenses incurred or paid by [BALCAP] in perfecting the security interest granted hereunder and in collecting the Indebtedness and in protecting or enforcing [BALCAP]'s rights under this Agreement, including but not limited to reasonable attorney's fees and legal expenses.

(BALCAP Term Loan Agreement, p.3)

15.   The BALCAP Lease provides, in relevant part, the following:

Upon the occurrence of an Event of Default, Lessor may, in its discretion, exercise any one or more of the following remedies with respect to any or all Leases or Equipment:   .  .  .   (5) recover direct, incidental, consequential and other damages for the breach of any Lease, including, the payment of all Rent and other amounts payable thereunder (discounted at the Discount Rate with respect to any accelerated future amounts), and all costs and expenses incurred by Lessor in exercising its remedies or enforcing its rights thereunder (including all Attorneys' Fees).  .  .  .

(BALCAP Lease, § 12(a)(5))

16.   The next step is dealing with the second requirement under

- 6 -

section 506(b) is to determine whether the provisions in the loan documents provide for the fees sought in the Application. This requires that the court examine whether the services described in the Application fall within the scope of the attorney fee provisions relied upon by the Applicants. See In re Strode, No. 07-10160, 2007 Bankr. LEXIS 3461 (Bankr. W.D. Ky. Oct. 15, 2007).

17.  The BA asserts that a portion of the fees are not encompassed by the fee provisions contained in the Applicants' contracts. The fees involved in this objection are certain fees that resulted from services that were performed by McGuireWoods in defending the Applicants in a civil action that was filed against the Applicants by Michael Torres, a TSN shareholder, asserting a claim for tortious interference with contract. This tort action was filed in the Superior Court of Wake County in February of 2009. During that period, extensive services were provided by a number of the attorneys at McGuireWoods in opposing the claim asserted against the Applicants, including numerous conferences with employees of the Applicants and with other counsel in the case, preparation of various motions, responding to discovery requests, extensive legal research and preparation of briefs, participation in a mediation, and appearing in court on behalf of the Applicants. These services were provided over a five-month period and were performed by attorneys who expended 126.9 hours in performing such services and gave rise to fees totaling $36,631.50. The BA argues that these

- 7 -

fees do not fall within the fee provisions in the loan and lease documents of the Applicants and therefore should be disallowed. The court agrees. In the tort action, Mr. Torres alleged that the Applicants tortiously interfered with a contract between Mr. Torres and TSN under which TSN agreed to purchase his stock in TSN. In describing the conduct of the Applicants, Mr. Torres alleged:

> 86. B of A acted without justification when it attempted to force Mr. Torres to surrender his rights in regard to his agreements with TSN, even after Mr. Torres agreed to sign a Subordination Agreement that granted B of A the status it sought without surrendering his rights in regard to TSN.

> 87. When Mr. Torres refused to abandon his rights to sue TSN for a breach of the agreement, and when Mr. Torres refused to make B of A his attorney-in-fact in the event of a bankruptcy filing by TSN, B of A induced TSN to not perform its contract with Mr. Torres.

> 88. B of A's efforts to compel Mr. Torres to abandon his rights, and its efforts to induce TSN to abandon its contract with Mr. Torres were not reasonable related to the protection of any of B of A's legitimate business interests.

> 89. As a direct and proximate result of B of A's tortious interference with contract, Mr. Torres has been damaged in an amount in excess of $10,000 to be proved at trial.

In arguing that the fees incurred in defending the Torres tort action are recoverable, the Applicants rely upon the portion of their loan agreement that provides for reimbursement "for any reasonable costs and attorneys' fees incurred by [BofA] in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in

connection with this Agreement. . . ." The fees incurred in defending against the Torres suit were not incurred in connection with the enforcement of preservation of any rights or remedies under the BofA loan agreement and do not fall within the provision relied upon by the Applicants. The Torres suit against the Applicants did not involve an attack upon or challenge to any of the obligations, security interests or remedies held by the Applicants under their loan and lease documents. Mr. Torres sought instead only to recover monetary damages from the Applicants based upon the malicious conduct described in the Torres complaint. The cost of defending such an action clearly is outside the scope of the attorney fee provisions in the loan documents and is not something for which TSN can be held responsible. The Applicants argue that the subordination terms and other demands made by them were justified and made in order to cure a default under their loan documents resulting from the agreement between Mr. Torres and TSN. Whether or not this is correct, it does not change the nature of the Torres suit and the fact that it was a tortious interference with contract action brought by a third party and did not contest or attack any of the rights and remedies of the Applicants under their loan and lease documents. Accordingly, the Applicants are not entitled to recover the $36,631.50 of fees incurred in defending the Torres suit.

18. There are other services included in the Application which

have been objected to by the BA as not being within the scope of the attorneys fee provisions of the loan documents.   The services identified by the BA in this part of the objection include services related to preparation of the proofs of claim that the attorneys prepared and filed on behalf of BofA and BALCO, legal research regarding various confirmation issues that was conducted when proposed plans of reorganization submitted by the Debtors were under consideration, objecting to one of the Debtors' motions to extend the exclusivity period for filing a plan and disclosure statement, participating in the negotiation of the exit financing that was provided for in confirmed plan, preparation of the loan documents involved in the post-confirmation financing provided for under the Plan and the preparation of the ballots that were filed by BofA and BALCO in order to vote on the plan of reorganization that was confirmed.   The objection to these services is not well founded. In addition to providing for the reimbursement of fees incurred in enforcing and preserving the rights and remedies of BofA under the loan documents, the loan agreement also provides that in the event a bankruptcy case is filed by the Debtors, BofA "is entitled to recover costs and reasonable attorneys' fees incurred by [BofA] related to the preservation, protection or enforcement of any rights of [BofA] in such a case."   Taken in the context of a contested chapter 11 case such as the present case, all of the above-described services fall within the foregoing provisions of the loan agreement.

The preparation and filing of a proof of claim was related to the preservation, protection and enforcement of the rights of the Applicants, as was the legal research concerning proposed plans of reorganization containing provisions that affected the rights of the Applicants.   See In re O'Connor, 413 B.R. 726 (Bankr. D. Mont. 2008)(allowing fees for filing a proof of claim, reviewing the plan of reorganization and filing a request for special notice); In re Dwiggins, 359 B.R. 717 (Bankr. W.D. Ark. 2007)(fees for attending meeting of creditors allowed as a cost of collecting the secured indebtedness); In re Williams, 174 B.R. 307, 309 (Bankr. D. Kan. 1994), aff'd, 183 B.R. 895 (D. Kan. 1995)("attorneys' fees associated with collection of a note and realizing on a security interest" covered legal expenses incurred in obtaining adequate protection and in negotiating a plan of reorganization).   The same is true regarding objecting to further extensions of the exclusivity period and negotiations by the attorneys concerning the provisions in a plan affecting the Applicants, including whether and under what terms the Applicants should provide the financing required under the proposed plan.   These are matters that are related to protecting and preserving the rights of the Applicants and, as such, fall within the attorney fee provisions in the loan documents.

19.   The third requirement under section 506(b) is that the fees and costs sought by the applicant be reasonable and necessary. This requirement is disputed by the BA who challenges the necessity

and reasonableness of a portion of the fees sought by the
Applicants.

20.  In Harman v. Levin, 772 F.2d 1150, 1152 (4th Cir. 1985),
the Court of Appeals for the Fourth Circuit held that in making a
determination regarding attorney's fees in a bankruptcy case, the
court's analysis should include the twelve factors which are set
forth in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978).
These factors, which were adopted from Johnson v. Georgia Highway
Express, Inc., 488 F.2d 714 (5th Cir. 1974), are as follows: (1) the
time and labor required; (2) the novelty and difficulty of the
questions; (3) the skill requisite to properly perform the legal
services; (4) the preclusion of other employment by the attorney due
to acceptance of the case; (5) the customary fee; (6) whether the
fee is fixed or contingent; (7) time limitations imposed by the
client or the circumstances of the engagement; (8) the amount
involved and the results obtained; (9) the experience, reputation,
and ability of the attorneys; (10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the
client; and (12) awards in similar cases.[1]

21.  The procedure for making the Johnson analysis is explained

---

[1]There is a close relationship between the Johnson factors and
section 330 of the Bankruptcy Code.  In explaining this
relationship, the court in Harman observed that the twelve Johnson
factors are a "parallel but more detailed approach to addressing
the important considerations involved in setting attorney's
fees...."  772 F.2d at 1152.

- 12 -

in <u>Daly v. Hill</u>, 790 F.2d 1071, 1078 (4th Cir. 1986).  As pointed

out in <u>Daly</u>, the decision of the Supreme Court in <u>Blum v. Stenson</u>,

465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), "shifted the

timing of the <u>Johnson</u> analysis as it has been applied in this

Circuit."  <u>Daly</u>, 790 F.2d at 1078.  Determining the lodestar figure

first and then applying the <u>Johnson</u> factors as an adjustment to that

figure was disapproved out of a concern that upward adjustments of

a lodestar figure sometimes can result in "double counting".  <u>Id.</u>

at 1077.  The court in <u>Daly v. Hill</u> ruled that under <u>Blum</u> the proper

point at which the <u>Johnson</u> factors are to be considered is at the

outset in determining reasonable hourly rates and the reasonable

hours.  The court explained the proper procedure as follows:

> Under <u>Blum</u>, the critical focus in calculating
> a reasonable attorney's fee is in determining
> the lodestar figure.  If a lodestar figure is
> properly calculated, adjustment of that figure
> will, in most cases, be unnecessary.
> Consequently, <u>Blum</u> has shifted the timing of
> the <u>Johnson</u> analysis, as it has been applied in
> this Circuit.  The proper point at which the
> <u>Johnson</u> factors are to be considered is in
> determining the reasonable rate and the
> reasonable hours.  A fee based upon reasonable
> rates and hours is presumed to be fully
> compensatory without producing a windfall.  In
> "exceptional circumstances," this presumptively
> fair lodestar figure may be adjusted to account
> for results obtained and the quality of
> representation.  Under <u>Anderson</u>, only <u>Johnson</u>
> factors one and five were properly considered
> in determining the lodestar fee.  As <u>Blum</u> makes
> clear, the lodestar fee is now the proper focus
> of the entire <u>Johnson</u> analysis in most
> cases. . . .  A proper computation of the
> lodestar fee will, in the great majority of
> cases, constitute the "reasonable fee"

contemplated by § 1988."

Id. at 1078.

22.    In accordance with the foregoing authorities, the first step in dealing with the fee application now before the court is to establish the lodestar figure through the application of the twelve Johnson factors.  The second step involved in the process is to then determine whether there are any exceptional circumstances which were not addressed in the court's twelve-factor analysis which warrant any adjustment of the lodestar figure.

23.    The first of the Johnson factors involves a consideration of the time and labor involved in the case.  This requires an examination of the work performed and a determination of whether the work performed is legal work and whether the amount of time spent in doing the work is reasonable. The burden is upon the Applicants to show the number of hours expended in providing the services is reasonable.  In making this evaluation,  the court should take into account whether the services were necessary, whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed by each particular service and that the court ascertain and eliminate any services that are ministerial or nonlegal and any unnecessary duplication of services by the attorneys who performed services in the case.  If counsel has not exercised "billing judgment" and excluded from the itemization of services hours that

- 14 -

are excessive, redundant or otherwise unnecessary, then the court should impose such "billing judgment" itself by eliminating any such time. See Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

24. The total number of hours described in the Application is 776.4 hours.[2] This figure includes 297.3 hours for services that were provided prior to the petition date and 479.1 hours for services provided after these cases were commenced. The services performed pre-petition were significantly different from the bankruptcy-related post-petition services and will be analyzed separately.[3] An analysis of the pre-petition services must begin with an adjustment necessitated by the ruling contained in paragraph

_____

[2]There is a discrepancy between the number of hours itemized in Exhibit B to the Application (776.4) and the number of hours referred to in the body of the Application (797.70). The correct figure appears to be the figure contained in Exhibit B since that is where the time expended for providing the services is itemized with time entries for each attorney.

[3]There is a split of authority regarding whether the reasonableness requirement under section 506(b) applies to fees that an oversecured creditor incurred pre-petition. See e.g. Welzel v. Advocate Realty Inv., LLC (In re Welzel), 275 F.3d 1308 (11th Cir. 2001)(federal reasonableness requirement is applicable); contra In re Leatherwood Corp., 302 B.R. 250 (Bankr. N.D. Ohio 2003). This issue is not presented in the present case. Under section 3.6(a)(6) of the confirmed plan in this case, all expenses and costs of BofA are to be reimbursed under section 506(b) and are to be paid on the effective date rather than being included in BofA's proof of claim and paid over time. Consistent with these provisions BofA included all of its fees and expenses, including the pre-petition fees and expenses, in the Application and did not include any of the attorneys' fees and costs in its proof of claim.

seventeen that the fees related to the Torres litigation should be disallowed. The Torres litigation accounted for 126.9 hours of services and fees of $36,631.50. The disallowance of the Torres fees has very little impact on the fees sought for post-petition services since only .6 hours (accounting for fees of $224.20) of the disallowed services were performed after the petition was filed. The disallowance of the Torres fees, however, does mean that the number of pre-petition hours listed in the Application (i.e., 297.3) must be reduced by the number of pre-petition hours involving the Torres services (i.e., 126.3) and that the total dollars sought in the Application for the pre-petition services (i.e., $87,132.00) must reduced by the number of dollars resulting from the pre-petition Torres services (i.e., $36,407.30). This leaves 171 hours of pre-petition services and pre-petition fees of $50,724.70 for evaluation.

25. The pre-petition services began on January 9, 2009 when the attorneys were consulted as a result of a possible default under the BofA loan documents resulting from the financial obligations assumed by TSN under an agreement to purchase the stock in TSN owned by Mr. Torres. The only evidence regarding the nature of the pre-petition services is the Application which reflects that there were numerous communications between the attorneys and representatives of BofA regarding the impact of the TSN/Torres agreements under the loan documents, that the attorneys drafted and re-drafted a proposed

forebearance agreement, a proposed subordination agreement and proposed new security documents and had extensive communications with BofA and the attorneys for TSN and Mr. Torres regarding the agreements, that the attorneys reviewed the loan documents and the TSN/Torres agreements and provided advice as to whether the was a default under the loan documents and assisted with the preparation of default letters that apparently were sent to TSN and, finally, when the settlement negotiations were unsuccessful, prepared a complaint and related documents utilized to institute a civil action against TSN alleging claims for breach of the loan agreement and for claim and delivery.  Although the 171 hours involved in providing these pre-petition services is a large expenditure of time, there were circumstances that increased the time required beyond what ordinarily would be expected.  The attorneys were called upon to evaluate a somewhat complex settlement between TSN and Torres against the covenants contained in the loan documents.  The discussions and negotiations that followed were multi-party from the outset, involving the attorneys for both TSN and Mr. Torres as well as counsel for other shareholders and bankruptcy counsel for TSN once TSN began to consider a bankruptcy filing.  The involvement of multiple parties increased the time involved in conducting the discussions and reporting to BofA regarding the status of the matter as it unfolded.  Also, a considerable expenditure of time was required to draft the complaint and claim and delivery documents

required once the negotiations failed and the decision to file suit was made.  It is understandable that the two attorneys[4] who handled the litigation aspects of the work were in the McGuireWoods Raleigh office since the litigation involving BofA was filed in Wake County. However, five different attorneys in the Charlotte office[5] worked on the BofA matters involving TSN which resulted in overlapping involvement on the part of the various attorneys such as the documents prepared by McGuireWoods being reviewed by several attorneys and numerous inter-office conferences and conferences with BofA involving two or more of the five attorneys.  The applicants have failed to offer an explanation of why it was necessary for all of these attorneys to be involved with the work involving the TSN matters or why so many conferences involving multiple attorneys were necessary or reasonable.  Based upon the extent of the overstaffing and excessive multiple-attorney conferences, the court has concluded that 17 hours of the pre-petition services should be disallowed, representing compensation of $5,049.00.

26.  The court will next consider the post-petition time and labor and evaluate whether the post-petition services provided by McGuireWoods involved necessary legal work that was performed in a reasonable amount of time, using the same criteria discussed in paragraph 23.  The total number of hours for services provided after

[4]Messrs. Anderson and Bowers.

[5]Messrs. Vaughn, Pryor, Johnston, Parrott and Ms. Pugh.

the Petition Date is 479.1 hours for services that were performed between July 24, 2009 and December 31, 2010. Although the validity of the security interests of BofA and BALCAP was not disputed and it was conceded that they were oversecured, there were disputed issues throughout the case involving the terms for Debtors' use of cash collateral, the adequacy and timing of the Debtor's financial reporting and budgets and whether and under what terms BofA would provide the post-confirmation financing required for the Debtors to continue in business.

27. In summary, the post-petition services began with the attorneys reviewing the schedules and initial motions filed by the Debtors and included work related to Debtors' use of cash collateral that was sought throughout the case and involved the preparation and review of various orders related to continuing use of cash collateral and participating in at least four hearings on the use of cash collateral as well as other hearings that were held throughout the case; also work related to business, budget and financial reporting issues involving the Debtors; preparation and filing of proofs of claims on behalf of BofA and BALCAP; monitoring and evaluating the status of adequate protection during the case; receipt, review and evaluation of the proposed plans and disclosure statements submitted by the Debtors; monitoring the cases while the Debtors sought outside financing; presenting and then negotiating with respect to BofA's objections to providing post-confirmation

financing when the Debtors turned to BofA for the required post-confirmation financing; legal research regarding legal issues related to the plans and disclosure statements proposed by the Debtors; preparing for and participating in a lengthy mediation regarding the contested confirmation issues involving the plan treatment proposed for BofA and BALCAP; drafting the loan and security documents required for the post-confirmation financing provided by BofA under the Plan; preparation and filing of ballots for approval of Plan; and the final closing of the new financing under the Plan.  The vast majority of the post-petition services were provided by Robert A. Cox, Jr. and James Trevor Johnston who provided approximately 90% of the post-petition services.  Most of the remaining services were provided by Anna L. Reimers and Staci E. Rosche, attorneys in McGuireWoods' Charlotte office who apparently specialize in commercial lending and restructuring of commercial loans and leases, and apparently who were responsible for preparing the loan and lease documents required for the restructuring and continuation of financing by BofA and BALCAP. These latter services occurred near the end of these cases after an agreement was reached regarding a consensual plan that called for BofA and BALCAP to continue to finance the Debtors post-confirmation.[6]  The services provided by McGuireWoods consisted of

---

[6]One of the objections of the BA was that the description of services attached to the Application was inadequate because of extensive redactions that were made to preserve the attorney-client

legal work which was necessary and appropriate in this case and did not to a material degree include ministerial or nonlegal work nor any unnecessary duplication of services.  Moreover, the services were performed in a reasonable amount of time, considering the complexity and importance of the issues and tasks addressed by the various services.  This factor does not warrant any adjustment in the number of hours included in the Application for post-petition services.

28.  The second <u>Johnson</u> factor involves the novelty and difficulty of the questions or work involved in the case.  While this case did not involve novel legal issues, there were significant difficulties to be addressed.  These were cases in which the positions of the parties were at odds, particularly regarding the manner in which the claims of the Applicants would be treated under a plan of reorganization and whether, contrary to the wishes of the Applicants, continued financing by the Applicants would be provided, and if so, under what terms and conditions.  Also, during most of the case the acrimonious dispute between TSN and Mr. Torres continued unabated and resulted in delay and extra work and expense for all of the major parties in interest, including BofA.  The difficulties generated by the contentious and time-consuming nature of these cases is illustrated by amount of time required of the

---

privilege.  The Applicants have overcome this objection by providing the court with a copy of the description of services without any redactions.

attorneys for the Committee during the same period covered by the Application (637.60 hours) and for the Debtors during that period (1,899.05 hours), and such difficulties were a factor in the amount of time expended by Applicants' attorneys in this case. While these and the other circumstances of this case, do not warrant an upward adjustment of hourly rates, they do help explain why the number of hours expended by Applicants' attorneys were required in these cases.

29. The third <u>Johnson</u> factor requires consideration of the skill required to properly perform the legal services described in the Application. While these cases were contentious, they did not require extraordinary skill to perform the services covered by the Application. While these were not necessarily routine Chapter 11 cases, the issues were not so numerous or difficult that any upward adjustment of compensation is warranted beyond the normal rates of compensation that are discussed <u>infra</u> under the fifth factor.

30. The fourth <u>Johnson</u> factor deals with whether the employment in this case resulted in preclusion of other employment by the attorneys. This factor involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes. There is no evidence that this factor is operative in these cases.

- 22 -

31.   The fifth factor in <u>Johnson</u> is the "customary fee" which requires that the court consider "[t]he customary fee for similar work in the community. . . ." <u>Johnson</u>, 488 F.2d at 718.  In the context of these cases involving employment on an hourly basis, this factor perhaps is more aptly phrased as the "customary hourly rate" and involves consideration of the prevailing market rate of compensation in the relevant market.  In the Fourth Circuit the relevant market for determining the prevailing market rate ordinarily is the community in which the court making the determination sits. <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 175 (4th Cir. 1994); <u>National Wildlife Fed'n v. Hansen</u>, 859 F.2d 313 (4th Cir. 1988).  However, in circumstances where it is reasonable to retain attorneys from other communities, the rates in those communities "may also be considered." <u>Rum Creek Coal Sales</u>, 31 F.2d at 175.  Rates charged by attorneys from other communities or markets "may be considered when 'the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally,' and the party choosing the attorney from elsewhere acted reasonably in making the choice." <u>Id.</u> at 179 (quoting <u>National Wildlife Fed'n v. Hansen</u>, 859 F.2d 313, 317 (4th Cir. 1988)).  It follows in the present case that unless it was necessary to go outside this District to employ counsel for the Applicants, the relevant market in this case is the local community. In deciding whether it was reasonable or necessary to employ counsel

- 23 -

from another community, it is appropriate for the court to focus on the size and complexity of the case, the amounts at stake and the degree of experience and expertise required to handle the case. If a case is so large or so complex that there are no attorneys in the community who are qualified to handle the case, necessity may dictate that counsel be employed from outside the community. In such a situation, there is a strong case for using the prevailing market rate from the community in which the attorney regularly practices. Unlike the situation in Rum Creek, however, this is not a case in which local counsel was not available because of the size of the case, the complexity of the case, the specialized nature of the case or for any other reason. Based upon the limited size, complexity and scope of this case and the availability of highly qualified local counsel in this District, the court concludes that the relevant market for determining the customary hourly rate for the post-petition services in this case is the local community, i.e., the Middle District of North Carolina.[7]  See e.g., In re

---

[7]This would not be true as to the pre-petition services which were provided by attorneys located in Raleigh who were employed to handle litigation in Raleigh and attorneys in Charlotte who were employed to confer with and advise bank employees who were located in Charlotte. These services preceded the filing of these bankruptcy cases and were provided at a time when the legal matters at issue had no meaningful connection with the Middle District of North Carolina. It, therefore, was entirely reasonable that attorneys from outside this District were employed by the Applicants. There has been no objection or evidence that the hourly rates charged for the pre-petition services exceeded the prevailing rates where such services were performed and such hourly rates therefore have not been adjusted.

- 24 -

Cambern, 134 B.R. 565, 568-71 (Bankr. E.D. Tex. 1991); In re Waldoff's Inc., 132 B.R. 329, 335 (Bankr. S.D. Miss. 1991); In re Seneca Oil Co., 65 B.R. 902, 911 (Bankr. W.D. Okla. 1986); In re Geofreeze Corp., 50 B.R. 200 (Bankr. E.D. Va. 1985).

32.   The question that remains with respect to the fifth Johnson factor is whether the hourly rates charged by McGuireWoods in this case fall within the prevailing hourly rates in the Middle District of North Carolina for attorneys of similar skill and ability while engaged in performing the type of work that was performed by McQuireWoods in this case.   In making this comparison, the determination of the prevailing hourly rates in this District may be based on the personal knowledge of the court regarding prevailing rates in the local market.   Rum Creek Coal Sales, 31 F.2d at 179.   As previously noted, most of the post-petition services included in the Application were performed by Mr. Cox as the lead attorney at an hourly rate of $378 and by Mr. Johnston at an hourly rate of $255.   During the relevant period, Mr. Cox was a partner in McGuireWoods with fifteen years of experience, mostly in insolvency and bankruptcy work, while Mr. Johnston was an associate with seven years of experience in similar work.   During the period covered by the Application, the prevailing hourly rate for attorneys comparable to Mr. Cox performing work comparable to that involved in these cases was $350 per hour and the prevailing hourly rate for attorneys comparable to Mr. Johnston performing comparable work was $235.

There was no showing that any of the post-petition work in this case, including the work related to the documentation and closing of the new financing provided by the Applicants, required any more experience or expertise than would be expected of attorneys comparable to Messrs. Cox and Johnston and, therefore, the time expended by the other partners who performed services in these cases likewise will be allowed at $350 per hour.

The usual hourly rate for paralegals in this District is $110 absent a showing of specialized experience or skill or performance of services beyond that ordinarily provided by paralegals. Considering the showing made regarding the nature of the services provided by the McGuireWoods paralegals, the usual hourly rate of $110 is appropriate for the time expended by the McGuireWoods paralegals.

33. The sixth factor from the Johnson case requires consideration of whether the fee is a fixed or contingent fee as bearing upon what the attorney's expectations were at the beginning of the case. Obviously, in this case McGuireWoods did not have a contingent fee arrangement and contemplated from the outset that it would be compensated at fixed hourly rates. No adjustment to the customary hourly rate is warranted on the basis of this factor.

34. The seventh Johnson factor requires consideration of the effect of any time limitations imposed by the client or the circumstances of the case. This factor recognizes that priority work which delays the attorney's other legal work is entitled to

some premium.   There were no more time constraints or limitations in this case than in a typical case of this size and, therefore, this factor is not operative in this case.

35.   The eighth factor from the Johnson case requires a consideration of the amount involved in the case and the results obtained by the attorney.   The size of the present case and the amounts involved are not so great that any upward adjustment is called for based on the eighth factor.

36.   The ninth factor from the Johnson case involves the experience, reputation and ability of the attorneys.   The attorneys who performed the services described in the Application are skilled and experienced and have a good reputation which is adequately recognized by the hourly rates that are approved under the fifth factor.

37.   The tenth factor from the Johnson case requires the court to consider the possible impact of the case being "undesirable." There was no evidence that the Applicants had any difficulty in finding counsel in this case or that representation of the Applicants carried with it any negatives that would adversely impact the attorneys.   Consequently, this factor has no impact in this case.

38.   The eleventh Johnson factor involves the nature and length of the professional relationship with the client.   The Application reflects that McGuireWoods has an ongoing relationship with the

Applicants and that the hourly rates that were charged in these cases are negotiated rates the attorneys regularly charge when representing the Applicants. Thus, there is no evidence from which the court could find that the nature and length of the relationship between McGuireWoods and the Applicants should have any effect upon the hourly rates which should be approved in this case.

39. The twelfth factor from the <u>Johnson</u> case involves the court taking into account awards in similar cases. In determining what constitutes the prevailing hourly rates in this District, the court considered the hourly rates which have been awarded in comparable Chapter 11 cases in this District.

40. Based upon the foregoing analysis, the court finds that the following hourly rates are reasonable for the attorneys and paralegals who performed post-petition services in these cases on behalf of the Applicants: $350 for Mr. Cox and the other partners who provided services, $235 for Mr. Johnston, $225 for the other associates and $110 for paralegals. The next step in arriving at the loadstar figure is to multiply these hourly rates by the number of hours reasonably expended by the attorneys and paralegal. This computation is as follows:

| NAME | POSITION | HOURS | RATE | AMOUNT |
|---|---|---|---|---|
| Robert A. Cox, Jr. | Partner | 222.3 | 350.00 | 77,805.00 |
| Anna L. Reimers | Partner | 17.6 | 350.00 | 6,160.00 |
| Staci E. Rosche | Partner | 8.6 | 350.00 | 3,010.00 |
| James Trevor Johnston | Associate | 216.7 | 235.00 | 50,924.50 |

| | | | | |
|---|---|---|---|---|
| Les S. Bowers | Associate | 4.9 | 225.00 | 1101.50 |
| Teadra G. Pugh | Associate | 1.1 | 225.00 | 247.50 |
| Regina M. Lucas | Paralegal | 7.3 | 110.00 | 803.00 |
| | | | | |
| | | | TOTAL: | 140,051.50 |

41. As reflected in the above figures, the loadstar figure for the compensation for post-petition services is $140,051.50. After making the adjustments for the Torres services, involving a deduction of $36,631.50 as discussed in paragraph seventeen, and the adjustment for the overstaffing and excessive attorney conferences, involving a reduction of $5,049.00 as discussed in paragraph twenty-five, the loadstar figure for the pre-petition services is $45,675.70.

42. The last step in determining final compensation is for the court to determine whether there are any exceptional circumstances in this case which call for an adjustment of the loadstar figures. No such exceptional circumstances are present in this case. Therefore, the aggregate loadstar figure of $185,727.20, arrived at as set forth in this opinion, constitutes reasonable compensation for the allowable services rendered on behalf of the Applicants by McGuireWoods during the period covered by the Application and should be allowed to the Applicants pursuant to section 506(b) of the Bankruptcy Code.

42. The Applicants also are entitled to an allowance of $6,829.44 for expenses Applicants paid as reimbursement to

- 29 -

McGuireWoods for expenses that were reasonably and necessarily incurred by McGuireWoods in the course of their representation of the Applicants.

An order in accordance with this memorandum opinion will be entered contemporaneously with the filing of this memorandum opinion.

This 27th day of June, 2011.

WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

John H. Small, Esq.
P.O. Box 26000
Greensboro, NC 27420

Katherine J. Clayton, Esq.
P.O. Box 1800
Raleigh, NC 27602

Robert A. Cox, Jr., Esq.
P.O. Box 31247
Charlotte, NC 28231

David A. Matthews, Esq.
128 S. Tryon Street, Suite 1800
Charlotte, NC 28202

Michael D. West, Bankruptcy Administrator